IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION


| | | |
|---|---|---|
| THE ARC OF VIRGINIA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No.: 3:09cv686 |
| | ) | |
| TIMOTHY M. KAINE, et al, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |


**UNITED STATES' MEMORANDUM OF LAW AS AMICUS CURIAE IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS**

   The United States of America, by counsel and pursuant to the Order of the Court entered November 23, 2009, submits the following Memorandum of Law as Amicus Curiae in Opposition to Defendants' Motion to Dismiss:

## I. INTRODUCTION

   This lawsuit challenges the decision by Defendant Timothy M. Kaine, Governor of the Commonwealth, and other Commonwealth officials, to proceed with plans to build a large state-run facility to care for approximately seventy-five adults with disabilities who have been independently evaluated and found eligible to live in the community with assistance. Using state funds to build a new, segregated state-run facility under these circumstances violates the Americans with Disabilities Act (ADA) and the Rehabilitation Act of 1973 and is in direct contravention of the requirement to integrate persons with disabilities into the community as mandated by the Supreme Court in *Olmstead v. L.C.*, 527 U.S. 581 (1999).

   Plaintiffs allege a claim under *Olmstead* based on the continued placement of Southern Virginia Training Center ("SEVTC") residents in segregated, institutional settings when all of the facility's residents have been found to be qualified to receive services in less restrictive settings and the State has alleged no fundamental alteration. *Olmstead* at 607. Furthermore, a State can violate *Olmstead*'s integration mandate based on the manner it chooses to administer the services its provides to individuals with disabilities, including "plan[ning] the settings in

which mental health services are provided, and allocat[ing] resources within the mental health service system." *Disability Advocates Inc. v. Paterson*, 598 F.Supp.2d 289, 318 (E.D.N.Y. 2009). Rather than building capacity for community-based services, the State is exacerbating its existing failure to comply with *Olmstead* by choosing to allocate its resources in a way that ignores the needs of the individuals with disabilities that it serves and perpetuates the institutional bias that the Court recognized in *Olmstead*. *Olmstead* at 601 (citing to Brief for United States as Amicus Curiae 6-7, 17). Plaintiffs thus allege an existing title II violation based on the State's failure to move individuals into community settings where they have been found qualified for such settings and alternatively based on the risk created for perpetuating such unnecessary segregation through the expenditure of significant sums to construct an institution while failing to build the State's community services. In its November 23rd Order, this Court approved the United States' request to participate as *amicus curiae* in this case, and based upon that ruling, the United States argues, herein, that Defendants' motion to dismiss should be denied.

Defendants have filed a motion to dismiss the Complaint pursuant to Rule 12, Fed. R. Civ. P., on several grounds: (1) The ARC of Virginia ("ARC") has no standing either by itself or in a representative capacity; (2) this matter is not ripe for adjudication because no one has been selected to live in the new facility; (3) the only persons who will reside at the new facility are persons who choose to live there after they are properly evaluated; (4) the Complaint fails to state claims under *Ex parte Young,* 209 U.S. 123 (1908); and (5) *Ex parte Young* claims against Defendants Governor Kaine and Viola O. Baskerville, Secretary of Administration of the Commonwealth of Virginia, are otherwise improper.[1] At this early stage of the case, Plaintiff is entitled to have the Court presume that all well-pleaded facts are true and the Court should draw reasonable inferences in favor of Plaintiff. The facts alleged demonstrate that the ARC has associational standing, and has presented claims that meet the requirements of the ripeness

---

[1]As Defendants do not contest Plaintiff's ability to bring claims against Defendants Reinhard and Tavenner, the United States does not take a position on Defendants' *Ex parte Young* arguments involving remaining Defendants.

doctrine.  Further, the ARC may sue the Defendants because the organization is entitled to sue state defendants pursuant to *Ex parte Young*.

## II.  <u>SUMMARY OF FACTS</u>

The current Southeastern Virginia Training Center ("SEVTC") is a state institution for Virginians with intellectual and developmental disabilities located on a 120-acre compound in an isolated section of Chesapeake, Virginia.  Complaint ¶ 25.  It is segregated from the neighboring properties on all sides. Complaint ¶ 27.  There are multiple "No Trespassing" signs on the SEVTC property.  Complaint ¶¶ 26, 28, 29.

The SEVTC, which is operated by the Virginia Department of Behavioral Health and Developmental Services (DBHDS), currently houses approximately 156 individuals with intellectual and developmental disabilities.  Complaint ¶ 61.

In his proposed budget for 2010, Defendant Kaine proposed closing SEVTC and redirecting money that had been earmarked for construction at SEVTC to build community-based housing for people with intellectual disabilities.  Complaint ¶¶ 41, 42.  The Complaint alleges that Defendant Kaine stated that SEVTC residents "don't need to be institutionalized".  Complaint ¶ 41.  Other Commonwealth officials publicly supported the Governor's proposed plan to close SEVTC and to provide persons located at SEVTC with community-based services.  Complaint ¶ 43.

In 2009, the Virginia General Assembly passed several budget items related to this matter.  Budget Items 103.05(A)(1)and (2) directed Commonwealth Departments and officials to rebuild and resize the SEVTC to a 75-bed facility "to serve profound and severely disabled citizens" and directed that certain appropriated funds in the amount of $23,768,000 be transferred for that purpose.  Complaint ¶ 45.  In addition, Budget Item 103.05(A)(3) directed Commonwealth Departments to build, acquire, or renovate 12 community-based Intermediate Care Facilities (ICF-MR) and 6 MR Homes in Health Planning Region V.  This budget item stated that priority should be given to projects that could be completed on existing state owned property within Health Planning Region V.  Complaint, Exhibit A.  Budget item 103(A)(6) directed the Governor and other Commonwealth officials to "initiate an expedited, fast track

capital outlay process to ensure the timely availability of both the rebuilt and resized" SEVTC

and the 12 community-based Intermediate Care Facilities (ICF-MR) and 6 Mental Retardation

Homes in Health Planning Region V." Complaint ¶ 49.

Meanwhile, on June 23, 2009, the State's contractor, Human Services Research Institute

("HSRI") of Portland, Oregon, prepared a report entitled Information Brief for the Virginia

Office of the Department of Behavioral Health and Developmental Services of Virginia SIS

Comparisons for SEVTC and Comprehensive Waiver Populations. Complaint ¶ 53. The

Institute used the Supports Intensity Scale (SIS) to assess and compare 156 people housed in the

SEVTC and a sample group of 521 people in the Virginia's comprehensive waiver program.

"Virginia has used the Supports Intensity Scale (SIS) for years to write better individual service

plans for people in the community and to describe the support needs of individuals being

served." Complaint, Exhibit B at 1. HSRI's assessment concluded that all the individuals with

developmental disabilities assessed, including the 156 residents living at the SEVTC, are "all

clinically eligible for Medicaid and each person can be served by the Virginia comprehensive

waiver." Complaint, Exhibit B.

ARC is a not-for-profit corporation and the Virginia chapter of The ARC of the United

States. Complaint ¶ 6. It is devoted to advocacy on behalf of persons with intellectual and

developmental disabilities and to "promoting and improving supports and services for all people

with intellectual disabilities." Complaint ¶ 6. Its membership consists of people with

intellectual disabilities. Complaint ¶ 7.

Some ARC members currently reside in SEVTC. Complaint ¶ 94. There are also ARC

members "at risk of being admitted to SEVTC." Complaint ¶ 12. These members are on the

Commonwealth's waiting list for Medicaid services. Complaint ¶ 95. Each of these individuals

has been found by representatives of the Commonwealth to meet the State's criteria for

institutionalization; some have been found in "urgent" need of services in order to avoid

institutionalization; if these individuals do not receive community-based services, they are at risk

of being institutionalized and admitted to SEVTC. Complaint ¶ 95. ARC alleges that this case

has been brought on behalf of ARC members who are "qualified individuals with disabilities" within the meaning of the ADA.  Complaint ¶ 99.

ARC opposes plans to build a new segregated institution and has been actively advocating that SEVTC residents be provided with community-based services.  Complaint ¶¶ 6, 59, 139.  On or about June 29, 2009, following the issuance of the HSRI report, ARC wrote to the Governor and asked that he defer building the new institution so that he could first study the results of the survey, a request that was subsequently denied by the Virginia Secretary of Health and Human Services.  Complaint ¶ ¶ 54, 55.  A subsequent request that Commonwealth officials defer construction of the new segregated facility and explore other alternatives for implementing Budget Item 103.05(A)(1) so as to provide benefits and services to SEVTC residents in the most integrated setting appropriate to their needs has not been acted upon.  Complaint ¶ 90.

ARC has alleged that it is pursuing this action "to protect the rights of its members who are or may become residents of SEVTC and are, therefore, threatened with being placed in a new segregated institution rather than in the most integrated setting appropriate to their needs." Complaint ¶ 12.  ARC further alleges that "these individuals have each suffered injuries, or are threatened with injuries . . . that would allow them to bring suit against the Defendants in their own right."  *Id*.  ARC is also pursuing this action "in its own right because it has had to divert resources from its previously planned projects and efforts in order to oppose the Defendants' plan." Complaint ¶ 13.  ARC's efforts to oppose the budget directives at issue have resulted in a decrease of staff and monetary resources which the ARC planned to use in support of other priorities. Complaint ¶ ¶ 140-147.

The Defendants are proceeding to implement a plan to construct the new 75-bed facility on the SEVTC compound that will be populated by current and future SEVTC residents.  Complaint. ¶ ¶ 44, 45, 52.  The Commissioner of DBHDS announced this plan at the meeting of the SEVTC Advisory Committee in August 2009, and in testimony to the General Assembly in September 2009.  Under Defendants' plan, all of the current residents will be evaluated and their needs and supports will be assessed. Declaration of Heidi R. Dix ("Dix Dec.") ¶ 10 (attached as Exh. A to "Defendants' Notice of Filing" Exhibits A-E in support of their Memorandum of Law

In Opposition to Plaintiff's Motion for Preliminary Injunction and Motion to Dismiss filed November 23, 2009 (Dkt. 20)). Defendants have indicated that they will not use the Supports Intensity Scale (SIS), a nationally recognized assessment tool, to determine the support needs of the SEVTC residents with intellectual disabilities. Complaint ¶ 67. The Commissioner of DBHDS, however did state that each resident will be evaluated "at least annually to determine if they meet criteria to continue to reside at the existing SEVTC facility or have the ability to live in the community." Dix Declaration ¶ 10.

In accordance with Defendants' plan, 65 SEVTC residents will be chosen to live in the new facility whether or not those persons actually need to reside in an institutional setting and receive services there. Complaint ¶ 69. The remaining 10 beds in the new facility will be filled with SEVTC residents "who are transitioning from or to community settings." Complaint ¶ 70. The current SEVTC residents who are not placed at the new facility will be placed in the Intermediate Care Facilities and the MR homes provided by Budget Bill Item 103.05(A)(3) or in other community placements. Complaint ¶¶ 70, 71.

In a letter dated July 6, 2009, the Commissioner for the Department of Behavioral Health and Development Services, James S. Reinhard, M.D., advised Plaintiff's counsel that the "process for determining the identity of the individuals who will be offered SEVTC beds is currently under development" and that no resident had been selected as a candidate for an SEVTC bed at that time. Complaint ¶ 57.

Defendants have received two proposals to build a separate and segregated 75-bed facility. Complaint ¶ 87. At the November 20, 2009 hearing before this Court, Defendants' counsel reiterated that the State will proceed with entering a final contract to build the new facility in December. The Defendants will sign a contract with one bidder for the construction of the building in December 2009. Complaint ¶ 88. Construction is expected to begin in August 2010. Complaint ¶ 88.

The Complaint challenges the basis and justification for the Commonwealth's plan to build the new facility on SEVTC property. For example, Plaintiff alleges that the Defendant Commissioner stated that the 75-bed census for the new facility was not arrived at through any

"science or study." Complaint ¶ 64. A DBHDS representative admitted that there will be very little or no difference between the service needs of those who will be selected to live at the new facility and those who will be transitioned to community-based facilities. In October 2009, a Deputy Commissioner of DBHDS, stated that the 75-bed census was not based on the individualized needs of the SEVTC residents and that the 75-bed census seemed "arbitrary." Complaint ¶¶ 83-85.

## III. ARGUMENT

*Olmstead* held that States are required to provide community-based treatment for individuals with disabilities "when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *Olmstead* 527 U.S. at 607. The State of Virginia has already determined that all of the current residents of SEVTC are qualified to receive services in less restrictive settings (Complaint, Exhibit B), yet the State has not moved these individuals to more integrated settings and instead is charging ahead with the construction of another segregated institution for SEVTC's residents to reside. The State has not raised a fundamental alteration defense, and indeed by spending additional funds on another segregated facility, the State would be hard pressed to raise this defense.

Furthermore, as the court in *Disability Advocates Inc. v. Paterson* articulated, a state's administration of services for individuals with disabilities is included within the purview of title II: an *Olmstead* claim can be rooted in "a public entity's obligation to make reasonable modifications[2] to its service system to enable individuals with disabilities to receive services in the most integrated setting appropriate to their needs." *Disability Advocates, Inc.* 598 F.Supp.2d at 317. Specifically, the Court in *Disability Advocates* pointed to the way in which the State administered its mental health service system by "plan[ning] the settings in which mental health

---

[2]This obligation derives from the ADA title II reasonable-modification regulation. 28 C.F.R. § 35.130(b)(7).

services are provided, and allocat[ing] resources within the mental health service system." *Id*. at 318. Plaintiffs allege that Virginia's administration of services for individuals with intellectual disabilities creates a substantial risk that individuals with disabilities will be placed in unnecessarily segregated institutions. Complaint ¶ 113 . Rather than building community capacity, the State is exacerbating its existing failure to comply with *Olmstead* by choosing to allocate its resources in a way that ignores the needs of the individuals with disabilities which it serves and perpetuates the institutional bias that the Court recognized in *Olmstead*. *Olmstead* at 601 (citing to Brief for United States as Amicus Curiae 6-7, 17). Such allegations state a claim for a title II violation under the ADA.

**A. This Case is Ripe for Review**.

Defendants posit that this case is not ripe for adjudication because no individual with a disability has yet been assigned to the new 75-bed SEVTC facility. Memorandum of Law in Support of Motion to Dismiss at 5. Defendants argue that because none of the current SEVTC residents, including ARC members, have been assigned to the facility, ARC's claims are premature. *Id*. at 13. In addition, Defendants argue that because the only persons who will reside in the new facility will be those who choose to live there once they are properly evaluated, Plaintiff cannot point to any present, direct harm to the residents. *Id*.

**1. The Case is Fit for Review and The Court Need Not Await Further Action by Defendants To Rule on Legal Questions In This Case.**

The ripeness doctrine is " 'designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.' " *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807-08 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)). Determining ripeness, the Court must "balance 'the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration.'" *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006), citing *Franks v. Ross*, 313 F.3d 184, 194 (4th Cir. 2002)*; see also McInnis-Misenor v. Maine*

-8-

*Medical Center*, 319 F.3d 63 (1st Cir. 2003) citing *Abbott Labs. v. Gardner,* 387 U.S. 136, 149 (1967).

Notwithstanding Defendants' claims to the contrary, this case is ripe for adjudication for several reasons. The issues are fit for review because the Court is bound by the Supreme Court decision in *Olmstead* that requires States to integrate individuals with disabilities into the community if they are found capable of community placement unless the State can prove that such placement would lead to a fundamental alteration of the State's services for persons with disabilities. *Olmstead,* 527 U.S. at 607. The current residents of the SEVTC have all been found eligible for community placement by an independent evaluation process ordered by the State. Complaint ¶ 53. Placing those persons into a newly constructed, large segregated state-run facility, when at a minimum, the State could elect to use the money to build new smaller facilities in the community, directly contravenes the Supreme Court's decision in *Olmstead* and violates the ADA. *Olmstead, 527 U.S. at 607.* This Court was assured at the November 20th conference by Defendant's counsel that the decision to contract to build the large segregated facility is final. Thus, the state legislature's approval of funds for such a facility presents a decision ripe for review. When, as here, the paramount issue confronting the Court requires it to resolve a conflict between state and federal law, there is no abstract disagreement between the parties and thus the Court is free to resolve the pending legal question. The Court need not await construction of the new facility and actual placement of the SEVTC residents in order to determine that the case is ripe for review.

> a. **All of the current residents of SEVTC satisfy *Olmstead* requirements for community placement, and the State is precluded from placing them in a segregated institution unless there is a fundamental alteration defense.**

Plaintiff's allegations should be analyzed under the framework adopted by the Supreme Court in *Olmstead v. L.C.*, 527 U.S. 581 (1999). In *Olmstead*, the Supreme Court held that a violation of ADA Title II's "integration mandate" is a form of discrimination that violates the statute. This mandate requires that "when a state provides services to individuals with disabilities, it must do so 'in the most integrated setting appropriate to their needs.' 28 C.F.R.

35.130(d); 28 C.F.R. 41.51(d)."  *Olmstead*, 527 U.S. at 607.  The Court in *Olmstead* explained

the contours of the ADA's integration mandate, recognizing that "unjustified isolation . . . [is]

discrimination based on disability."  *Id*. at 597.  As the Court explained, "institutional placement

of persons who can handle and benefit from community settings perpetuates unwarranted

assumptions that persons so isolated are incapable or unworthy of participating in community

life . . . and institutional confinement severely diminishes individuals' every day activities."

*Olmstead*, *Id*. at 600.  A State's obligation to provide services in the most integrated setting is

not unlimited, however, and may be excused in instances where a state can prove that the relief

sought would result in a "fundamental alteration" of the State's service system.  *Id*. at 601-03.

 *Olmstead* thus signaled a clear departure from States unnecessarily relying on

institutional placements for individuals with disabilities.  Plaintiff's Complaint alleges facts

suggesting an administrative decision by the Commonwealth that clearly disregards the

integration mandate: a decision to devote significant state resources to the construction of a

segregated facility, in direct contravention of the needs of the individuals with disabilities and

the ability for such individuals to be served in more integrated settings.

 Plaintiff's Complaint alleges that all of SEVTC residents (including ARC members) "can

be served in the community" and that Defendants' plan for placement puts all residents of

SEVTC at risk for placement in the new, segregated facility.  Complaint ¶¶ 53, 136.  Defendants

argue in their Motion to Dismiss that "[i]n no circumstance will an individual who chooses to

reside in the community be forced to move to the new SEVTC."  Motion to Dismiss at 6.

However, to contend that individuals with disabilities will have such a "choice" requires that

community-based services be available and that individuals are fully informed of these

opportunities.  Defendants attempt to reassure this Court that it will not place individuals in the

new facility if they would prefer to live in the community, however, no support is offered for

how the State would ensure this commitment is fulfilled.  Motion to Dismiss at 6.  Defendants

bear the burden of demonstrating that Plaintiff's concerns about unnecessary institutionalization

are unfounded, as another Court noted:

> Defendants claim that Plaintiffs are not at risk of institutionalization because ... some might find care through some other community-based service. However, Defendants bear the ultimate responsibility for ensuring the State's compliance with federal disability law. 'Thus, to the extent that Defendants are claiming that alternative services satisfy their obligations under the integration mandate, Defendants certainly bear the burden of ensuring more than a 'theoretical' availability of such services. *Brantley*, 2009 WL 2941519, at *10.

*V.I. v. Wagner*, ___ F. Supp. 2d ___, 2009 WL 3486708 at *11 (N.D. Ca. Oct. 23, 2009) (copy attached).

Allegations that the Defendants' administration of services discriminates against individuals with disabilities because the Defendants' allocation of their resources favoring institutional settings over community-based settings was found to state an actionable title II claim in *Disability Advocates Inc. v. Paterson*, 598 F. Supp. 2d 289, 319 (E.D.N.Y. 2009). The Court there found "if Defendants allocated their resources differently, [plaintiffs] could receive services in a more integrated setting." *Disability Advocates* at 319. The Court went on to state:

> Title II of the ADA applies to the claims in this case. An *Olmstead* claim concerns a ***public entity's obligation to make reasonable modifications to its service system to enable individuals with disabilities to receive services in the most integrated setting appropriate to their needs.*** Defendants, as required by New York law, administer the State's mental health service system, plan the settings in which mental health services are provided, and allocate resources within the mental health service system.... Discrimination, in the form of unjustified segregation of individuals with disabilities in institutions, is thus prohibited in the administration of state programs. The statutory and regulatory framework governing the administration, funding, and oversight of New York's mental health services--including the allocation of State resources...at issue here--involves "administration" on the part of Defendants.

*Id.* at 317-18 (emphasis added).

Plaintiff here alleges that Defendants' expenditure of significant resources to construct a segregated facility is contrary to the State's obligations to ensure that individuals with disabilities receive services in the most integrated setting appropriate to their needs, thus stating a claim under title II of the ADA.

      b.    **Resolution of a pure legal question, such as the supremacy of the ADA and *Olmstead* over state decisions about how to provide services does not need to await the construction and actual placement of the persons in the new facility.**

In this case, the Court is presented with the paramount question of whether title II of the ADA, section 504 of the Rehabilitation Act, and the *Olmstead* integration ruling can supersede Virginia's plans to build a segregated facility. This case satisfies both prongs of the ripeness doctrine because it presents this purely legal issue and because delayed review will present significant harm to ARC and its resident members. *Miller v. Brown*, 462 F. 3d at 319; *Nebraska Pub. Power Dist. v. MidAmerican Energy Co.,* 234 F.3d 1032 (8th Cir. 2000) *reh'g and suggestion for reh'g en banc denied* (holding that case was ripe for adjudication because it raised a purely legal question about the meaning of a contract, all the facts necessary to the resolution of the case had been established, and delayed adjudication would only work significant hardship on parties.)

This case is ripe for adjudication because the building of the facility is not contingent upon "speculative contingencies" that may in some cases defeat a claim of ripeness. The legislative directives in the budget item are mandatory and appear to leave nothing to the discretion of Virginia officials. The core provisions of the budget item are mandatory, e.g., "shall build and resize the [SEVTC] to a 75-bed facility to serve profound and severely disabled clients;" "shall transfer $23,768,000" for this purpose; "shall ... initiate an expedited, fast track capital outlay" for both a 75-bed facility and the ICF-MR and the MR facilities. Complaint, Exhibit A.

In *Miller v. Brown*, 462 F.3d 312 (4th Cir. 2006), the Fourth Circuit held that the case was ripe for review because the only issue was a legal one regarding whether Virginia's open primary provisions barring voters from voting for candidates in more than one party was a violation of the First Amendment. In reaching its decision, the court rejected the arguments of the Board of Elections that there were too many uncertainties in the case to permit resolution. Although the Court recognized that there was some uncertainty as to whether another candidate would file to run for office during a specific window of time, it rejected the Defendant's argument that the case was not ripe for review. The court reasoned that a failure by the Court to render a timely decision in the context of this set of facts would significantly affect the parties, non-parties and the election process itself.

The district court also based its ripeness decision on the fact "[t]he Board has made no formal decisions concerning the 2007 election." J.A. 111. The Board is charged with carrying out Virginia's election laws. *See* Va.Code Ann. § 24.2-103 (detailing the Board's duties). At no point has the Board, or any other State actor, suggested that the open primary law will not be enforced. *See Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988) (finding standing to seek pre-enforcement review of statute where no evidence that law would not be enforced). The Board's February 9, 2005, letter and the Assistant Attorney General's concession at oral argument are further evidence the law will be enforced.

*Id.,* 462 F.3d at 321.

In *Texas Midstream Gas Services, LLC, v. City of Grand Prairie*, 2008 WL 5000038 (N.D. Tex. Nov. 28, 2008) (copy attached), a natural gas company (TMGS) sought to enjoin the city's application of a city development code provision that required TMGS to obtain a specific use permit (SUP) to build a compressor station. TMGS alleged that the code provision was expressly preempted by federal law and that the city was violating the Constitution, and federal and state law merely by requiring a permit pursuant to its code. The city countered by arguing that TMGS's claims were not ripe because the permitting process had not been completed, it could not be determined if the city would enforce the local code provision at that stage, and it was undetermined as to whether TMGS would suffer any injury if it did. In rejecting the city's argument, the district court held that the Complaint was ripe for review because the issue of preemption was a "predominantly legal" issue concerning the city's authority to require the permit, it was clear that TMGS intended to begin construction soon, and the company's claims did not rely on "unforeseeable future events." 2008 WL 5000038 at *3. The Court also noted the harm that would ensue if it were to defer action on the request for injunctive relief. The Court therefore granted injunctive relief with respect to the preemption issue.

Likewise, in this case, the issue before the Court is actually whether the State's decision to build a facility that will segregate individuals unnecessarily is in violation of law, and the conclusion is inexorable that in the face of evaluations of current residents who are able to live in the community with assistance, the creation of a new, segregated institution violates federal law.

    2.    **Even the risk of institutionalization provides a basis for a title II claim and should not present ripeness problems.**

Finally, it is clear that the mere risk of institutionalization of an individual with a disability also supports a claim that title II of the ADA and section 504 have been violated.  In *Fisher v. Oklahoma Health Care Authority*, 335 F.3d 1175 (2003), the Tenth Circuit rejected defendants' challenge that plaintiffs could not make an integration mandate challenge until they were placed in the institutions.  The Court reasoned that the protections of the integration mandate "would be meaningless if plaintiffs were required to segregate themselves by entering an institution before they could challenge an allegedly discriminatory law or policy that threatens to force them into segregated isolation....nothing in the *Olmstead* decision supports a conclusion that institutionalization is a prerequisite to enforcement of the ADA's integration requirements." *Id*. at 1181.  The Court went on to conclude that "*Olmstead* does not imply that disabled persons, who, by reason of a change in state policy, stand imperiled with segregation, may not bring a challenge to the state policy under the ADA's integration regulation without first submitting to institutionalization." *Id*. at 1182.  *See also M.A.C. v. Betit*, 284 F.Supp. 2d 1298, 1309 (D. Ut. 2003) (adopting *Fisher*'s position that a plaintiff need not currently be institutionalized to bring integration regulation claim); *Brantley v. Maxwell-Jolly*, ___ F. Supp. 2d. ___, 2009 WL 2941519, *7 (N.D.Cal. Sep. 10, 2009) (copy attached) (allowing plaintiffs to bring title II claim that statutory cuts in adult day health care services would put individuals currently residing in community at risk of institutionalization).

In a recent ruling on a request for a preliminary injunction in *V.L. v. Wagner*, 2009 WL 3486708 (N.D. Ca. 2009), the Court reached this conclusion:

> Although *Olmstead* addressed ongoing institutionalization, plaintiffs who currently reside in community settings may assert ADA integration claims to challenge state actions that give rise to a risk of unnecessary institutionalization. See *Fisher v. Oklahoma Health Care Auth.*, 335 F.3d 1175, 1181-82 (10th Cir.2003) (imposition of cap on prescription medications placed participants in community-based program at high risk for premature entry into nursing homes in violation of ADA); *Ball v. Rogers*, 2009 WL 1395423, at *5 (D.Ariz.) (failure to provide them with needed services "threatened Plaintiffs with institutionalization, prevented them from leaving institutions, and in some instances forced them into institutions in order to receive their necessary care" in violation of the ADA and Rehabilitation Act); *Mental Disability Law Clinic v. Hogan*, 2008 WL 4104460, at *15 (E.D.N.Y.) ("even the risk of unjustified segregation may be sufficient under *Olmstead*").

*Id.* at * 11.

In an even more attenuated fact pattern, the court in *Martinez v. Schwarzenneger*, 2009 WL 3353227 * 5 (N.D. Ca. Oct. 15, 2009) (copy attached) found that the impending possibility of wage cuts to care providers two months following the court's Order, and without consideration of possible alternatives that might have intervened before the State's statute took effect, were sufficient to allege a ripe claim.

> "Plaintiffs allege that the implementation of Section 12306.1(d)(6) and associated wage reductions will force Plaintiffs who wish to remain in their homes, and are able to do so with the help of in-home care, to enter institutions. Plaintiffs depend upon the services of IHSS providers in order to maintain their social and economic independence. These allegations sufficiently state disability discrimination claims under Olmstead."

*Id.* at * 5.

3. **The Court should not permit the construction of the building before ruling because the balance of hardship on the parties weighs heavily against postponing a decision here.**

The Court must balance the hardships on the parties of a decision at this juncture versus postponing a decision until the final brick is laid in the new facility. The harm to individuals at risk of placement in that facility against their wishes and the potential financial and job loss associated with aborting the plans at some mid-point in the process, or even upon completion of the facility, weigh in favor of this Court adjudicating this case immediately. All relevant steps leading up to the building of the new facility have been set in place by virtue of the passage of the budget items and the mandatory nature of its directives to Virginia officials and their respective departments. Complaint ¶¶ 87, 88. Moreover, the Commonwealth has signaled its clear intention to execute these directives in this lawsuit. The Court may decide that the construction of such a facility has been set in motion and completion of the facility will cause more harm than benefit to persons and entities impacted by the decision to build the facility and may enjoin the construction at this stage.

It is beyond peradventure that threatened injury can satisfy Article III standing requirements. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). "One does not need to await the consummation of a threatened injury to obtain preventative relief. If

-15-

the injury is certainly pending, that is enough." *Id.; see also Massachusetts v. EPA*, 549 U.S. 497 (2007). The Seventh Circuit held that the Sierra Club had standing and a ripe claim to challenge construction of a power plant that it argued would increase air pollution, and that it need not wait until the plant was completed and operational to make claims ripe for adjudication to stop the plant from being built. *Sierra Club v. Franklin County Power,* 546 F.3d 918 (7th Cir. 2008), *cert. denied,* 129 S.Ct. 2866 (June 29, 2009). "As a practical matter, it makes sense for the Sierra Club to challenge the validity of the Company's permit now, rather than waiting until the plant is operational." *Id. citing LeFleur v. Whitman*, 300 F.3d 256, 270 (2d Cir. 2002). Defendants in *Sierra Club* argued that the plaintiffs had to wait until actual construction began on the plant before the claim was ripe for review, but the court there rejected that argument.

A claim may be considered ripe in situations such as this where the legislature has directed funds to be allocated, and other formal agency decisions have been made. Because Virginia has allocated funds for the project there are no "speculative contingencies" that would prevent Virginia from acting in accordance with state law. The court in *Cardenas v. Anzai*, 311 F.3d 929 (9th Cir. 2002), held that the case was ripe for review because Hawaii had actually created a dedicated fund to distribute tobacco settlement proceeds as part of a multi-state tobacco settlement and had allocated its first payment. The court found that there was no longer any abstract disagreement about whether or when the distributions might occur in the future, despite the State's claim that a challenge would not be ripe until all the funds were distributed after many years.

### B. The ARC Complaint Satisfies Federal Pleading Requirements.

When considering a motion to dismiss the complaint for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept as true all material allegations of the complaint and construe them in the light most favorable to the plaintiff. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); *Warth v. Seldin*, 422 U.S. 490, 501(1975).

Under Fed.R.Civ.P. 8, a pleading that states a claim for relief must contain a short and plain statement of the grounds for the Court's jurisdiction; a short and plain statement showing that the pleading party is entitled to relief; and a demand for the relief sought. The current standard for an adequately pled complaint was set out in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Under *Twombly*, to state a claim, the pleading party's factual allegations must state a claim for relief that rises above the speculative level. 550 U.S. at 545. The Supreme Court recently reaffirmed and clarified the *Twombly* standard in *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." [*Twombly*,] at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*, at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*, at 557 (brackets omitted).

129 S.Ct at 1949-1950; *See also Feeley v. Total Realty Management*, ___ F. Supp. 2d ___, 2009 WL 2902505 (E.D. Va. Aug. 28, 2009) (copy attached).

The Complaint in this action sets forth a very detailed set of factual allegations that the Defendants have failed to comply with the mandates of title II of the ADA and section 504 of the Rehabilitation Act. At this stage of the proceedings, the Court must treat all material allegations as true and construe these allegations in favor of plaintiff. *Warth v. Seldin* 422 U.S. at 501. Contrary to Defendants' argument, the Plaintiff does allege concrete harm that exists because residents with intellectual and developmental disabilities presently reside in a segregated setting in violation of federal law and there is no question that under the plan proposed by the Commonwealth, some of those residents will be placed in the segregated institution whether they are eligible for community placements or not.

C. **ARC Has Standing to Bring This Action on Its Own Behalf and On Behalf of Its Members.**

It is well settled that to establish standing under Article III, the litigants must establish an "irreducible constitutional minimum of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555,

560 (1992). This "irreducible constitutional minimum of standing" contains three elements: (1) plaintiffs suffered actual or threatened injury; (2) the condition complained of caused the injury or threatened injury, and (3) the requested relief redressed the alleged injury. *Lujan*, 504 U.S. at 560-61. These three basic requirements are referred to as injury-in-fact, causation/traceability, and redressability. When examining whether plaintiffs suffered actual or threatened injury, the inquiry focuses on whether the injury-in-fact is (1) "concrete and particularized," and (2) actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan*, 504 U.S. at 560.

Defendants argue that ARC lacks standing under the ADA and the Rehabilitation Act as the representative of its members on the grounds that its members do not have standing to sue in their own right and the claims asserted and the relief sought would require the participation of its individual members. However, an association may have standing solely as the representative of the people who it serves. *Warth v. Seldin*, 422 U.S. at 511.

In *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333 (1977), Supreme Court established the three-pronged test for associational standing:

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

432 U.S. at 343.[3] *See also United Food and Commercial Workers Union Local 751 v. Brown Group Inc.*, 517 U.S. 544, 551-53 (1996) (finding that the first and second prongs of the *Hunt* test were of constitutional character but the third prong was not).

ARC's Complaint satisfies each of the three *Hunt* prongs. Under the first prong, ARC's members who reside at SEVTC would otherwise have standing to sue in their own right. ARC

---

[3]The *Hunt* test was subsequently reaffirmed in *International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America v. Brock*, 477 U.S. 274 (1986), where that Court specifically noted that very often an organization will present an especially efficient vehicle for litigation from the perspective of both the litigants and the judicial system. "[A]n association suing to vindicate the interests of its members can draw upon a pre-existing reservoir of expertise and capital." *Brock*, 477 U.S. at 289.

alleges that some of its members, though unnamed, currently reside in SEVTC. Since all of the approximately 156 residents residing in SEVTC have been determined by qualified professionals to be eligible for community-based services, the resident ARC members are currently suffering a very direct, personal injury by being denied access to a more integrated setting appropriate to their needs. The Supreme Court explicitly held that "[u]njustified isolation ... is properly regarded as discrimination based on disability." *Olmstead*, 527 U.S. at 597. Furthermore, ARC alleges that ARC and its staff were barred by SEVTC from soliciting membership in ARC and/or providing written information to SEVTC residents. Complaint ¶¶ 33-36. Action limiting opportunities of SEVTC residents to enjoy contact with non-disabled persons, coupled with the unnecessary segregation of SEVTC residents, allegations all deemed to be true at this stage, "severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment" prohibited by *Olmstead*. 527 U.S. at 601.

Under the second prong of *Hunt*, as Defendants concede, there is no question that the interests ARC seeks to protect are germane to its purposes. As an organization that advocates on behalf of individuals with intellectual and developmental disabilities, ARC clearly meets that test.

The third prong of the *Hunt* test asks whether the claim asserted or the relief requested by ARC requires the participation of any of its members injured by Defendants' actions. It satisfied the *Hunt* test that some ARC members reside in a segregated facility and that they have been denied the opportunity to reside in community-based facilities in the past, despite evaluations showing that they could be successfully integrated into the community. Rather than offering them community placements, the State is contracting to build another segregated facility, which states the requisite injury in fact and should not require the testimony of any member about the harm they suffer. This is particularly so because ARC seeks only declaratory and injunctive relief. Accordingly, because ARC can satisfy the three-pronged test, ARC has representational

standing under the ADA and the Rehabilitation Act to bring this action on behalf of its members with disabilities.[4]

### D. Defendants' *Ex parte Young* Claim Lacks Merit.

The United States believes that ARC's claim is ripe for adjudication and that ARC has sufficiently alleged standing to bring this suit (*See* III A, C), thus Defendants' argument that such "procedural defects" prevent a plaintiff from invoking Ex Parte Young lack merit. Motion to Dismiss at 16.

## IV. CONCLUSION

Based upon the foregoing arguments and authority cited in support thereof, the United States, as *amicus curiae*, urges this Court to deny Defendants' motion to dismiss and set this action on a schedule for discovery and final judgment. Plaintiff ARC has demonstrated that the Complaint satisfies all constitutional and prudential pleading requirements and that actions by

/ / / /

/ / / /

/ / / /

---

[4]Defendant also challenges ARC's reliance on *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) and ARC's claim that it has standing to sue on its own behalf. Among other things, Defendants allege that ARC has failed to show a "sufficiently concrete injury" to confer Article III standing, citing an unpublished opinion, *Maryland Minority Contractors Association, Inc. v. Lynch*, 203 F.3d 821 (4th Cir. 2000 ) that cited *Spann v. Colonial Village*, Inc., 899 F. 2d 24, 27 (D.C. Cir. 1990), *cert. denied*, 498 U.S. 980 (1990) for the proposition that the plaintiff cannot rely on resources spent on this litigation to support standing. However, as the Court in *Spann* also made clear, an organization can establish injury in fact if "it alleges that purportedly illegal action increases the resources the group must devote to programs independent of its suit challenging the action." *Spann*, 899 F.2d at 27. ARC has alleged similar injuries in fact, i.e., a drain on its time, resources, and expenditures in opposing the construction of the new facility.

the State of Virginia violate the ADA and the Rehabilitation Act of 1973, and as such the Court

has authority to grant Plaintiff the relief that it seeks in this matter.

     DATED this  24  day of November, 2009.

Respectfully submitted,

THOMAS E. PEREZ
Assistant Attorney General

SAMUEL R. BAGENSTOS
Deputy Assistant Attorney General

JOHN L. WODATCH, Chief
PHILIP L. BREEN, Special Legal Counsel
RENEE M. WOHLENHAUS, Deputy Chief
SHEILA K. DELANEY, Trial Attorney
Disability Rights Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW (NYA)
Washington, D.C. 20530
(202) 307-6309

NEIL H. MACBRIDE
United States Attorney

By:     /s/_____
Robert P. McIntosh
Virginia Bar Number 66113
Attorney for the United States of America
United States Attorney's Office
600 East Main Street, Suite 1800
Richmond, Virginia 23219
Telephone:  (804) 819-5400
Facsimile: (804) 819-7417
Email: Robert.McIntosh@usdoj.gov

CERTIFICATE OF SERVICE


I hereby certify that on the __24__ day of __November__, 2009, I will electronically file the foregoing UNITED STATES' MEMORANDUM OF LAW AS AMICUS CURIAE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

> Ishneila I. G. Moore
> Office of the Attorney General
> Email:  imoore@oag.state.va.us
>
> Jonathan Gerald Martinis
> Virginia Office for Protection and Advocacy
> Email:  jonathan.martinis@vopa.virginia.gov
>
> Kalena Cimone Marie Ek
> Virginia Office for Protection and Advocacy
> Email: Kalena.Ek@VOPA.Virginia.Gov


And I hereby certify that I will mail the document by United States mail, first-class postage prepaid, to the non-filing user(s) addressed as follows:



> ___/s/_____
> Robert P. McIntosh
> Virginia Bar Number 66113
> Attorney for the Defendant
> United States Attorney's Office
> 600 East Main Street, Suite 1800
> Richmond, Virginia 23219
> Telephone:  (804) 819-5400
> Facsimile: (804) 819-7417
> Email: Robert.McIntosh@usdoj.gov